**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

| | | |
|---|---|---|
| Darryl Graham | * | |
| 5541 Hartfield Avenue | | |
| Suitland, Maryland 20746 | * | |
| | | |
| Plaintiff, | * | |
| | | |
| vs. | * | Case No. 8-21-cv-310 |
| | | |
| Honeywell International, Inc. | * | **Jury Demand Enclosed Herein** |
| 300 South Tryon Street | | |
| Charlotte, North Carolina 28202 | | |
| | * | |
| Served on: | | |
| Honeywell International, Inc. | * | |
| C/O CSC-Lawyers Incorporating Service Co. | | |
| 7 St. Paul Street | * | |
| Suite 820 | | |
| Baltimore, MD 21202 | * | |
| | | |
| Defendant. | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## COMPLAINT

### I.    PRELIMINARY STATEMENT

1.     This action is brought to remedy retaliation in violation of the False Claims Act ("FCA"), 31 U.S.C. Section 3730(h) against Honeywell International, Inc. ("Honeywell"), as well as for damages to redress the deprivation of rights secured to Plaintiff, Darryl Graham ("Mr. Graham"), by Maryland's Wage Payment and Collection Law ("MWPCL").

### II.    JURISDICTION AND VENUE

2.     Jurisdiction of this Court is invoked pursuant to 28 U.S.C. Section 1331.

3.      Venue is proper in the Southern Division of the District of Maryland because the causes of action in this Complaint occurred in Silver Spring, Maryland, situated within said District and Division.

## III.    PARTIES

4.      Plaintiff Darryl Graham is a citizen of the United States and a resident of the State of Maryland.  At all times relevant hereto, Mr. Graham has resided at 5541 Hartfield Avenue, Suitland, Maryland 20746.

5.      Defendant Honeywell, a Delaware Corporation, with its headquarters in the State of North Carolina, operated a business in the State of Maryland.  Honeywell is a national security technology company.

## IV.    STATEMENT OF FACTS

6.      Honeywell submitted claims for payments to the U.S. General Services Administration ("GSA") under service contracts based on incorrect wage calculations and misrepresentations to GSA regarding which of its workers completed the work outlined by the respective contracts. After Mr. Graham complained to Honeywell regarding such false claims, or what he reasonably believed to be false claims, Honeywell retaliated against Mr. Graham by unlawfully terminating his employment on February 6, 2018, effective February 8, 2018, in violation of the anti-retaliation provision of the FCA. Just one month prior to his unlawful termination, Mr. Graham escalated his complaints to Honeywell related to what he reasonably believed to be Honeywell's unlawful reporting and certifications of employee time and illegal contract work shifting practices to the U.S. Government (GSA).  Honeywell's actions preceding and following Mr. Graham's termination provide additional evidence that his termination was in response to Mr. Graham's protected activities, as well as that its stated reasons for terminating

Mr. Graham's employment were mere pretexts asserted to mask its unlawful retaliation. Honeywell also failed to pay Mr. Graham all wages it owed him in violation of the MWPCL.

7.      Mr. Graham, a highly skilled steamfitter and journeyman with 25 years of experience in his field, began working for Honeywell on October 15, 2015.  Mr. Graham was assigned as a steamfitter journeyman to perform facility maintenance at the White Oak Campus of the U.S. Food and Drug Administration's ("FDA") Federal Research Center, in Silver Spring, Maryland ("White Oak"), under a contract between Honeywell and the United States Government – the GSA and the FDA. During Mr. Graham's employment with Honeywell, he was a member of the Steamfitters Local Union No. 602 of the United Association ("LU602" or "the union"),[1] which determined in pertinent agreements the contractual rate and terms of Mr. Graham's compensation per hour of work.

8.      The federal contract Mr. Graham worked on required facility maintenance from 6:00 p.m. to 6:00 a.m., five days per week, and coverage on Saturdays, Sundays and holidays ("nightshift contract").  The nightshift contract was in addition to a separate, existing federal contract between Honeywell and the GSA/FDA, which was for facility maintenance to be performed during regular daytime hours as well as Saturdays, Sundays and holidays ("dayshift contract").

9.      The scope of work for the two separate contracts were not identical, and the dayshift contract required work that was not part of the nightshift contract. Honeywell's contracts with GSA/FDA, providing the specific scope of the work requested, relied on the pay rates applicable to Honeywell's existing agreements with the union.

---

[1]   LU602 is a local union associated with the United Association of Journeymen and Apprentices of the Plumbing and Pipe fitting Industry of the United States and Canada ("AFL-CIO").

10.     Mr. Graham's and other steamfitters' hourly wages and shift differentials were determined by the negotiated agreement between the LU602 and the Mechanical Contractors Association of Metropolitan Washington, Inc., and the Steamfitters Local Union No. 602 of the United Association, including the Supplemental Service Agreement, between the Mechanical Contractors Association of Metropolitan Washington, Inc., and LU602 (effective August 1, 2016 through July 31, 2019) (collectively "the Agreement").  In addition, the number of hours constituting a workday, the range of start times, and under what circumstances Mr. Graham and other steamfitters were to be paid overtime compensation and holiday pay, among other requirements for wage rates, hours of work, shift premiums, reporting pay, pay differentials, overtime rates, holiday pay, and other benefits were also governed by the National Pneumatic Control Systems Installation & Service Agreement (2013 – 2018) ("the Service Agreement") – the agreement between the AFL-CIO (including LU602) and Honeywell Home & Building Control ("Honeywell").

11.     The Agreement expressly provides, under Article X, Section 24, "Eight (8) consecutive hours shall constitute the standard workday with a flexible starting time between 4:00 AM and 10:00 AM."  In addition, because Mr. Graham worked rotating shifts, he could have been compensated under Sections 34 and 35, which permitted, by mutual consent, a premium of 20% for Saturday, Sunday, and holiday shifts, during a four-day workweek, and a premium of 25% for the same shifts during a three-day workweek.  Based on Mr. Graham's profession and experience, his regular rate of pay ("RRP") for August 1, 2017, to July 31, 2018, was $46.79 per hour, and his overtime rate for overtime hours during Monday through Saturday (1.5 times his RRP) was $70.18.[2]

---

[2]   Mr. Graham's RRP for August 1, 2018, to July 31, 2019, would have been $47.89, and his overtime rate would have been $71.83.

12.     Honeywell was obligated to pay Mr. Graham all wages it promised him. Honeywell failed to do so in violation of the MWPCL.

13.     GSA's payments to Honeywell were based on the pertinent dayshift and night shift contracts for the facility services, which incorporated the wage requirements of the Agreement, Service Agreement, and the Supplemental Agreement for the laborers specified by the contracts, including the proper payment of overtime wages and holiday pay.

14.     In making a claim for payment to GSA under the service contracts based on incorrect wage calculations and misrepresentations regarding which workers completed the work outlined by the respective contracts, Honeywell submitted false claims to the U.S. Government.

15.     Starting early in Mr. Graham's employment with Honeywell, Mr. Graham observed that he was required to input his hours differently than the time that he and others worked, although Mr. Graham did not know his supervisors' motivation or purpose for doing so at the time.

16.     Throughout Mr. Graham's employment with Honeywell on the nightshift contract, however, Mr. Graham worked a "4-on, 4-off" schedule, at 12 hours per day, meaning that he worked 4 days, was off 4 days, and then worked 4 days, in succession.  Thus, Mr. Graham worked 4 days during some pay periods and 3 days during other pay periods.  Mr. Graham's hours on workdays were from 6:00 p.m. to 6:00 a.m.  Under the Agreement and Honeywell's contract with GSA, therefore, the standard workday was 8 hours, after which the remaining hours constituted overtime.  Mr. Graham should have been paid for 8 hours at the standard rate, and 4 hours at the overtime rate, for each 12-hour day of work. Mr. Graham's Honeywell supervisor, Project Manager Gary Ballenger ("Mr. Ballenger"), was aware of the contract's requirements as he previously stated to Mr. Graham that the actual time worked must

be recorded because Mr. Ballenger was previously audited regarding the time his employees entered that was inconsistent with contract requirements.

17.     After January 1, 2016, Mr. Ballenger, who again was one of Mr. Graham's supervisors, informed the nightshift employees that they were to input their time for each day worked as 10 hours of straight time (at the RRP) and 2 hours of overtime.  That structure violated the Service Agreement, which stated that "eight (8) consecutive hours per day shall constitute a standard work day" and that time worked in excess of eight hours in one day, Monday through Saturday was to be paid time and one-half. Neither Mr. Ballenger, nor any other supervisor at Honeywell, obtained Mr. Graham's agreement to move to a 10-hour standard workday, as required for any change to his existing standard workday.  That structure amounted to 40 regular hours and 8 overtime hours (2 hours per day) during a 4-day workweek, and 30 regular hours and 6 overtime hours during 3-day workweeks.  Mr. Graham submitted timesheets on January 10, 2016, and January 17, 2016, recording his time consistently with the Agreement – 8 hours of standard time and 4 hours of overtime for each 12-hour day worked.

18.     On January 18, Mr. Ballenger instructed Mr. Graham to record his time as the 10-hour standard workday, and Mr. Graham stated to Mr. Ballenger that he was wrong, and that the Agreement provided for an 8-hour standard workday.

19.     Mr. Ballenger contacted Chris Madello ("Mr. Madello"), the Business Representative for Mr. Graham's local union.  Mr. Madello then contacted Mr. Graham and stated that Mr. Graham's hours, like his nightshift team members' hours, were going to be counted as if the 10-hour standard workday applied.  Despite Mr. Graham's protests and the

plain language of the applicable contract,[3] Mr. Graham began recording his time in the manner required by his supervisor at Honeywell, Mr. Ballenger.

20.     Between January 2016 and January 2018, Mr. Graham complained to Messrs. Ballenger and Madello on numerous occasions that Mr. Ballenger was recording his and the other nightshift workers' time incorrectly and in violation of the contract with GSA.

21.     During the same period, Mr. Graham observed that the nightshift workers were frequently assigned work by Honeywell that was not part of the permissible scope of work for nightshift contract but was part of the dayshift contract.

22.     On May 3, 2017, Honeywell directed Mr. Graham to give a tour of the facilities and the work the nightshift crew completes to Scott Schroeder ("Mr. Schroeder"), Honeywell's General Manager of Field Operations.  Just before Mr. Graham started touring the facilities with Mr. Schroeder, one of Mr. Graham's fellow nightshift crew members cautioned Mr. Graham not to mention work performed by the nightshift crew that was not on the nightshift contract to Mr. Schroeder during the tour, because Mr. Graham might get in trouble for doing so with the nightshift crew's immediate supervisors.

23.     Following the tour, on May 4, 2017, Mr. Graham received an email from Mr. Schroeder, thanking Mr. Graham for providing the tour and praising Mr. Graham's work, stating, "I appreciate that you have approached it from a 'world class service' perspective," adding that he "consider[s] it a reflection of [Mr. Graham's] personal credibility that it is done

---

[3]   Mr. Graham complained verbally to Mr. Ballenger on or around January 1, 2016, upon learning of how he and others on the nightshift were instructed to input their time.  Mr. Graham input his time accurately on January 7, 2016, including 8 hours at RRP time and 4 hours of overtime, per each 12-hour shift.  Mr. Graham then complained again to Mr. Ballenger regarding the inaccuracy of Mr. Ballenger's instructions regarding the input of his time when Mr. Ballenger approached Mr. Graham on or around January 14, 2016, regarding Mr. Graham inputting his time differently than Mr. Ballenger previously instructed.

professionally. Keep up the great work . . . I believe you set that bar for 'A—Team' membership."

24.     In addition to the fact that Mr. Graham was selected to give Mr. Schroeder a tour of the White Oak campus, Mr. Schroeder's email to Mr. Graham demonstrates that Mr. Graham was considered a highly competent steamfitter and diligent and professional Honeywell employee.

25.     On the night of the tour, however, Mr. Graham's coworker alerted Mr. Graham to an issue. Namely, that the daytime contract foreman, Frank Manual ("Mr. Manual"), Mr. Ballenger, and others required the nightshift contract crew to perform work that was outside the permissible scope of work provided for in the nightshift contract.

26.     In October 2017, during one of Mr. Graham's shifts, a nightshift worker was injured while performing work that was outside the scope of work provided for in the nightshift contract.  The employee, like the other nightshift workers, had been required to clean on top of the roof of one of the buildings at White Oak, which was work specified in the dayshift contract and outside the scope of work in the nightshift contract.  While performing the work outside the scope of that provided for in the nightshift contract, the employee slipped and was injured. The assignment of the dayshift contract work to the nightshift contract crew was directed by Mr. Manual.  Following that situation, Mr. Graham became increasingly concerned that the nightshift crew was performing work that was part of the dayshift contract.

27.     Near the end of October 2017, Mr. Graham and his coworkers insisted to Mr. Manual that the nightshift workers should not continue performing the unfinished work of the employees who worked under the daytime contract, which was work outside the scope of the nightshift contract.  At that time, Mr. Manual assigned work from the dayshift contract to Mr.

Graham and his partner, Robert Wilkerson ("Mr. Wilkerson"), as well as the other nightshift

team – Ricardo Ramtahal ("Mr. Ramtahal") and Ed Malynaniki ("Mr. Malynaniki") – on a

regular basis.[4]

28.     Mr. Graham discussed the issue with his coworker, Mr. Ramtahal. Mr. Ramtahal

and Mr. Graham decided that Mr. Ramtahal would tell Mr. Manual that he and Mr. Graham

requested that, if Mr. Ballenger or Mr. Manual wanted to assign work that fell within the dayshift

contract to the nightshift team, Mr. Manual put the request in writing so that the supervisor

assigning the out-of-contract work would be held responsible, rather than the nightshift

employees. Mr. Ramtahal informed Mr. Graham that Mr. Manual became angry at the request.

29.     The next day, Mr. Manual stated to Mr. Graham in an intimidating and combative

tone, "No more being nice to y'all."  He further stated that if Mr. Graham wanted to "play by the

book," each shift would work exactly according to each shift's contract, and therefore, he would

no longer permit the nightshift to leave once the dayshift crew arrived, as he had done in the past.

Mr. Graham responded that would be fine, that he and the other nightshift crew members would

start work at 6:00 PM and leave at 6:00 AM, exactly as they were supposed to do, and that his

primary concern was not that the nightshift was having to complete extra work, but that they

were not supposed to be completing work on the dayshift contract.  Mr. Manual's apparent

frustration with Mr. Graham was caused by Mr. Graham's request that Mr. Manual and others in

management stop shifting the separate dayshift work onto the nightshift contract.

30.     Rather than uniformly follow his own rules regarding leaving early, however, Mr.

Manual continued permitting the dayshift crew to leave early once the nightshift arrived, and he

---

[4] Mr. Graham and his partner on the nightshift, Mr. Wilkerson, alternated nightshifts with the other nightshift team, Mr. Ramtahal and Mr. Malynaniki.

began singling out the nightshift in retaliation for Mr. Graham's complaint about impermissible shifting of work between contracts.

31.     Soon after Mr. Graham observed Mr. Manual permitting the dayshift workers to leave early, Mr. Graham approached Mr. Manual and requested that he and his coworker, Mr. Wilkerson, be permitted to leave 10 minutes early.  Mr. Manual became angry again, slamming his pen on his desk.  Mr. Manual stated in an aggressive and demanding tone, "Let me tell y'all what's going to happen.  I shouldn't have to send you no damn email to get you to do your job.  I should be able to tell you what work you've got to do, and you should do it."  Mr. Manual added, "I'm not trying to be a dick about it, but this is just the way it should be." Mr. Manual's statements made it clear that Mr. Graham would be punished for refusing to do work outside the scope of work in the nightshift contract or for requesting that Mr. Manual put his unlawful instructions to complete work on the wrong federal contract into writing.  Mr. Graham responded, "Ok" and left for the day.

32.     Thereafter, Mr. Graham did not stop working until the end of his shift at 6:00 a.m., regardless of when the dayshift crew arrived, and typically passed by Mr. Manual as Mr. Graham collected his things to leave soon after.  Two days after Mr. Manual's demand to Mr. Graham that he perform work leftover from the dayshift contract without having it in writing, Mr. Manual asked to speak with Mr. Graham as he was trying to leave. At that point, which was already after 6:00 a.m., Mr. Graham had already collected his things and was walking out of the building to leave.  Mr. Graham stated to Mr. Manual that he was no longer on the clock and asked Mr. Manual to walk with him on his way out to discuss whatever he wanted, because he needed to leave.  Mr. Manual demanded that Mr. Graham stop and talk to him, and that if he did not, he would be fired.  Mr. Graham repeated that he was no longer on the clock and would talk

to Mr. Manual if he would walk with him.  Mr. Manual stated that Mr. Graham was fired. After

leaving, Mr. Graham called Shop Steward Quinten Mincy ("Mr. Mincy") to discuss his apparent

termination by Mr. Manual and the ongoing issues over work on the dayshift's contract work

being improperly assigned to the nightshift.

33.     Around 7:40 a.m., Mr. Ballenger called Mr. Graham and informed him that Mr.

Manual did not have the authority to fire him, and that only he (Mr. Ballenger) had the authority

to do so.  Mr. Ballenger conceded, however, that because Mr. Graham did not have a certain

number of "write-ups" prior to "the incident," he did not believe he was permitted to fire him.

Mr. Ballenger then added that if the union gave him permission to fire Mr. Graham, he would do

so. During the conversation, Mr. Ballenger also expressed his retaliatory animus directly to Mr.

Graham for Mr. Graham's protected activity in complaining of what he reasonably believed to be

violations of the FCA. Mr. Ballenger stated to Mr. Graham, "Why do you complain so much?

Why can't you be more like Robert [Mr. Wilkerson]? He never complains."

34.     Upon information and belief, Mr. Madello spoke to Mr. Ballenger, and soon after,

Mr. Ballenger called Mr. Graham back and informed him that, according to Mr. Madello, he

could not fire Mr. Graham because Mr. Graham was not on the clock and was not required to

stop to meet with Mr. Manual.  Mr. Ballenger made it clear, however, that he was frustrated with

Mr. Graham's requests for written instructions for any tasks outside of the scope of the nightshift

contract, and that he would have terminated Mr. Graham if he had been given the authority to do

so.  Mr. Ballenger's statement indicates his retaliatory animus toward Mr. Graham for

complaining of contract violations, which is protected activity.

35.     Mr. Mincy called Mr. Graham soon after and offered to set up a meeting with Mr.

Graham, Mr. Manual, and Mr. Mincy.  The purpose of the meeting was to discuss Mr. Manual's

attempt to fire Mr. Graham and the circumstances surrounding it; however, the meeting was cancelled after Mr. Manual refused to attend.  Because of this, Mr. Mincy set up a new meeting that would include Mr. Mincy, Mr. Madello, Mr. Graham, Mr. Wilkerson, Mr. Ramtahal and Mr. Malynaniki.  The meeting lasted approximately an hour and a half.  Mr. Graham asked Mr. Mincy why Mr. Ballenger was not present for the meeting. Mr. Mincy informed Mr. Graham that Mr. Ballenger declined an invitation to attend the meeting. Mr. Graham discussed the scope of the nightshift contract work, his concerns about the shifting of unfinished and/or separate dayshift tasks to the nightshift, the improper way that the nightshift workers' timesheets were being recorded, and that their time was being calculated in a manner that violated multiple applicable contracts. Mr. Madello and Mr. Mincy did not provide an answer regarding whether things would change.  Mr. Madello had previously reassured Mr. Graham that the nightshift would receive 40 hours per week, rather than the 36 hours they currently received on their three-day week schedules. At the conclusion of the meeting, Mr. Madello informed Mr. Graham that would follow up with Mr. Ballenger to ensure that the nightshift would receive proper hours and pay.

36.     Even a month after that meeting, Mr. Ballenger and Mr. Manual still had not added the nightshift workers to the overtime rotations that the nightshift should have been offered pursuant to contract.  Although these days were available to Mr. Graham under the nightshift contract, Mr. Ballenger suddenly stopped permitting Mr. Graham and the other nightshift workers to work those hours soon after Mr. Graham's complaints regarding the improper work shifting.

37.     In December 2017, Mr. Graham called Mr. Madello and informed him of Mr. Ballenger's actions and asked to file a grievance.  Mr. Madello stated that he would instead call

Mr. Ballenger directly and tell him to change his policy to permit the nightshift to work on overtime days.  Upon information and belief, Mr. Madello called Mr. Ballenger, however, Mr. Ballenger never changed his policy or added the nightshift back to the schedule for overtime days.  Mr. Ballenger's repeated favorable treatment of the dayshift over Mr. Graham's shift further evidences his bias against Mr. Graham for his protected activities in reporting the scope of work contract violations to his supervisors. In further retaliation against Mr. Graham following said protected activity, Mr. Ballenger stripped the night shift of its ability to work a 13th hour for each shift during a three-shift week, which he had previously allowed if desired by each nightshift worker.

38.     Prior to January 2018, Mr. Graham verbally complained again to Mr. Madello regarding shifting work from the dayshift contract to the nightshift, as well as Honeywell's failure to comply with the wage and overtime requirements pursuant to the Agreement and the Services Agreement, as well as the Supplemental Agreement and the contract with the GSA/FDA.  Because Mr. Graham did not receive any response to his verbal complaints, Mr. Graham drafted an email to Mr. Madello on January 5, 2018, referencing the issues Mr. Graham discussed at the October 2017 meeting with Mr. Mincy and Mr. Madello.

39.     Upon information and belief, Mr. Madello shared Mr. Graham's arguments with management.

40.     Mr. Graham did not receive a response until approximately three weeks later, on January 26, 2018. When Mr. Madello responded, he stated that Mr. Graham had agreed to a 10 hour, four-day per week compressed schedule because he had waited too long to bring it up and, therefore, fell within the exception to the 8-hour workday rule provided by Section 25 of Article X.  That Section, however, required the "mutual consent of the Employer and Employee" to the

13

compressed schedule. Mr. Madello provided such argument, despite Mr. Graham complaining to management about the pay issues since he was instructed to record his time differently.

41.    Less than two weeks later, Mr. Ballenger – who had repeatedly expressed his anger and retaliatory animus towards Mr. Graham for attempting to stop the dayshift tasks from being assigned to the nightshift and who had retaliated against Mr. Graham on multiple occasions  – called Mr. Graham at home. After Mr. Graham answered, Mr. Ballenger stated, "I have to let you go."  Shocked by Mr. Ballenger's statement, Mr. Graham responded, "What do you mean?" Mr. Ballenger responded, "I have to fire you."  Mr. Graham finished his shift that morning at 6:00 a.m. Mr. Ballenger did not call him to communicate his apparent termination until 7:00 p.m.  Recalling very clearly that Mr. Ballenger had previously stated that he would fire him if the union permitted it, but that Mr. Graham did not have the required number of write-ups in his file, Mr. Graham had no idea what could have prompted Mr. Ballenger to terminate him. Mr. Graham asked, "For what?"  Mr. Ballenger responded, "Apparently you were using equipment without permission."  Again, Mr. Graham did not know what Mr. Ballenger was talking about and asked, "What equipment are you referring to?"  Mr. Ballenger responded, "Frank [Mr. Manual] told me that you were using the washing machine" in the Child Center on the White Oak campus.

42.    According to Mr. Ballenger, Mr. Manual told him that Mr. Graham's nightshift Foreman, Eddy Reynolds ("Mr. Reynolds"), told him that he warned Mr. Graham about using the washing machines and that Mr. Graham used the washing machines again recently. Surprised by the explanation, Mr. Graham started to explain the only issue he knew of relating to the washing machine in the Child Center, however, Mr. Ballenger quickly interrupted and stated, "That's what I heard" and added that he had not spoken to Mr. Reynolds yet.   Mr. Ballenger,

who had likely realized that his explanation for terminating Mr. Graham without any substantive facts regarding the false allegation was implausible, stated that he would call Mr. Reynolds and call Mr. Graham back.

43.     Less than an hour after Mr. Ballenger's first call, he called Mr. Graham a second time.  This time, Mr. Ballenger stated that he spoke to Mr. Reynolds.  Mr. Ballenger admitted that Mr. Reynolds informed him that he had not ever warned Mr. Graham for using the washing machine on the premises, and instead, that he had given Mr. Graham permission to use it if he obtained permission from the facility manager and it did not interfere with Mr. Graham's work. Indeed, Mr. Graham had previously discussed the washing machine with Mr. Reynolds almost a year earlier during which Mr. Graham informed Mr. Reynolds that he already had permission to use the washing machine, and he had used it on one occasion.  After that conversation with Mr. Reynolds, however, Mr. Graham did not use the washing machine ever again, and certainly had not done so recently.

44.     Mr. Ballenger also noted that he had called Mark Trecannelli ("Mr. Trecannelli"), Mr. Ballenger's supervisor, who told Mr. Ballenger that he could not fire Mr. Graham on the information regarding the washing machine.  Mr. Ballenger ultimately apologized for telling Mr. Graham that he was fired and that he should not have called him without all of the information. Mr. Graham thanked him for apologizing. Mr. Ballenger told Mr. Graham to report to work at his next scheduled shift.  Although it appeared that everything was fine, Mr. Graham was highly stressed by another attempt to terminate him without any legitimate basis for doing so, and the clear indication that Mr. Ballenger appeared to be looking for any reason to fire Mr. Graham in response to his complaints of contract violations was unnerving and harassing.

45.     On February 6, 2018, Mr. Graham's next scheduled shift, Mr. Graham arrived for

work at the office around 5:45 p.m.  Mr. Manual was in the office when Mr. Graham arrived,

along with Mr. Mincy,[5] and a security guard from the FDA.  Mr. Mincy told Mr. Graham that he

needed to speak to him.  Mr. Graham asked him what was going on, and Mr. Mincy stated that

Mr. Graham was no longer allowed at the jobsite.  He added that the decision was not his call,

and that it had come as a GSA request.  Mr. Mincy stated that accordingly, it was outside the

scope of the Union's ability to aid Mr. Graham since the request came from GSA. Mr. Graham

asked Mr. Mincy why this was happening, and he stated that he was just doing his job and did

not have all of the information regarding the reasons.  Mr. Graham gathered his things and turned

in his work phone, and he was escorted off the property by two FDA security guards.

46.     Two days later, on February 8, 2018, Mr. Graham received a call from Mr.

Madello.  Mr. Madello stated that Mr. Ballenger called him and asked if he could terminate Mr.

Graham. Mr. Madello further stated to Mr. Graham that he asked Mr. Ballenger if Mr. Graham

engaged in any conduct to warrant his termination and that Mr. Ballenger responded to Mr.

Madello that Mr. Graham had not engaged in any such conduct. Mr. Madello stated to Mr.

Graham that he further asked Mr. Ballenger if Mr. Ballanger had evidence against Mr. Graham

to constitute any terminable offense and that Mr. Ballenger responded to Mr. Madello that he did

not have any such evidence. Accordingly, Mr. Madello stated to Mr. Graham that he informed

Mr. Ballenger that he could not terminate Mr. Graham.

47.     Mr. Graham, who of course had been terminated regardless, stated to Mr. Madello

that he still did not know the reason for being removed from the site.  Mr. Madello stated that he

had further information and forwarded Mr. Graham a letter via email soon after.  The letter was

---

[5]  Don Butler and Mark Turpack, two other Honeywell employees, were also in the office.

from Denise Avery-Craft ("Ms. Avery-Craft"), Contracting Officer for GSA, to Mr. Ballenger and Mr. Schroeder. The letter was a request from GSA to Honeywell, purportedly requesting his removal from the White Oak campus because, "Mr. Graham has been observed by Campus Security Officers on two (2) separate incidents (December 7, 2017, and February 2, 2018) to be washing personal clothing items in the Child Care Center. Both of these incidents were reported to Mr. Eddy Reynolds of Honeywell." The letter goes on to allege, "Mr. Graham was given a warning that his behavior was inappropriate; however, he continued to conduct his personal affairs and neglect his duties as defined by the contract." These allegations were patently false, and Mr. Ballenger had previously admitted that Mr. Reynolds told him a completely different account than what was described in the letter, including the fact that he had only spoken to Mr. Graham about it a year prior and that he had given him permission. Mr. Graham, however, did not use the washing machine a single time after his previous discussion with Mr. Reynolds. Most importantly, the letter from Ms. Avery-Craft was dated February 6, 2018, *four days after* Mr. Ballenger called Mr. Graham at home and tried to fire him based on the unsubstantiated allegations, before he made any attempt to find out more about Mr. Manual's unverified statements. It was also after Mr. Ballenger's call with Mr. Madello where Mr. Madello informed Mr. Ballenger Honeywell had no legitimate grounds to terminate Mr. Graham. Clearly, Mr. Ballenger, who worked closely with Ms. Avery-Craft, acted on his retaliatory animus toward Mr. Graham for complaining of contract violations by requesting the letter from her, knowing that it would fall within one of the bases for termination under the applicable contracts because it came from Honeywell's government customer.

48.     Two months later, after research, Mr. Graham sent an email and certified letters to the individuals listed as recipients of the letter, as well as Ms. Avery-Craft, regarding the basis for his retaliatory termination, but did not receive a response.

49.     On June 18, 2018, Mr. Graham was able to speak to Ms. Avery-Craft by phone for several minutes, during which he asked her how she decided that Mr. Graham needed to be removed from the White Oak site.  Ms. Avery-Craft stated that Mr. Ballenger told her that Mr. Graham had committed an infraction, alleging that he had used washing machines on-site.  Mr. Graham pointed out that there was a camera in the Child Center and asked if she reviewed the video footage.  Ms. Avery-Craft stated that she had not, and Mr. Graham asked her why she would not have reviewed the footage from February 6, 2018, since it would have been easily accessible.  Mr. Avery-Craft became extremely defensive, insisting she did not have to review the footage to make the request, and stated that it was "stupid on [Mr. Graham's] part for using the washing machine."  Mr. Graham attempted to explain the true events, but Ms. Avery-Craft continued to talk over him until Mr. Graham finally thanked her for her time and said goodbye.

50.     Mr. Graham opted to send a follow up email to her instead so that he could provide an explanation in response to Ms. Avery-Craft's blind accusations. Mr. Graham never received a response.

51.     Pursuant to 31 U.S.C. § 3730(h), an "employee, contractor, or agent" is entitled to bring a claim for retaliation where such individual is "discharged, . . . threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of" his or her "lawful acts," that are carried out "in furtherance of an action under [the FCA] or other efforts to stop 1 or more violations of" certain provisions of the FCA.  Such prohibited conduct is listed under §3729(a)(1), and includes (1) knowingly presenting, or causing to be presented, a

false or fraudulent claim for payment or approval; (2) knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim, and (3) conspiring to commit a violation of either of such prohibitions. *See* §3729(a)(1)(A)-(C).

52.     Mr. Graham engaged in protected activity under the statute when he not only reported the fraudulent recording and billing practices to his supervisors, but also tried to prevent the prohibited conduct from continuing by repeatedly raising concerns over Honeywell's inaccurate and deliberately dishonest reporting of employee time.

53.     Even after Mr. Graham acceded to recording his time as Mr. Ballenger required, Mr. Graham continued investigating and taking notes on the improper employee time recording practices, he continued to complain to his supervisor and to others, participated in a meeting in which he raised his complaints on this issue and complaints regarding illegal work shifting practices, and then finally put his complaint into writing and emailed it to Mr. Madello.  At the time, Mr. Graham did not know another path to pursue after notifying the Project Manager, nightshift Foreman, and Business Representative for the Union, attempting to meet with Mr. Ballenger regarding these matters, participating in a meeting with Mr. Madello and others, and then putting his complaint in writing.  Mr. Graham expressed his reasonable and accurate belief that Honeywell's conduct violated the express terms of the Agreement and, in turn, the contract between Honeywell and the federal government.

54.     Honeywell's conduct – including its submission of false certified payroll reports, underpayment of Mr. Graham and other workers on the nightshift in violation of applicable contracts, and repeated and routine shifting of work on the daytime contract to the employees who were being paid through the nighttime contract – constitute numerous violations of 31 U.S.C. § 3729.  Mr. Graham clearly challenged his supervisors' illegal reporting of employee

time and shifting of work from the daytime contract to the nighttime contract, despite repeated harassment and retaliatory actions by Mr. Ballenger and Mr. Manual.  Mr. Ballenger also stated his motive to terminate Mr. Graham expressly, immediately after Mr. Graham insisted that Mr. Manual put his illegal requests in writing, when he stated that he would fire Mr. Graham if the union permitted it. Mr. Ballenger made this assertion despite the fact that he knew that Mr. Graham had not engaged in conduct that permitted such disciplinary action.  Soon after Mr. Graham escalated his complaints by putting the unlawful conduct into writing, he was suddenly terminated on the basis of an unsubstantiated and unverified accusation, which could not have been the basis for his termination without Ms. Avery-Craft's letter, which was dated days after Mr. Ballenger first attempted to fire Mr. Graham based on the same fabricated allegations. The temporal proximity (*i.e.*, the timing between Mr. Graham's protected activity of sending his supervisors information in writing, attempting to prevent further false and inaccurate claims for payment, and his subsequent bizarre and illegal termination) is *prima facie* evidence in this matter that Honeywell's claimed basis for terminating Mr. Graham was merely a pretext for retaliation.

55.     The facts surrounding Mr. Graham's termination further demonstrate that such false accusations, that Mr. Graham was impermissibly washing his clothes at the worksite on February 2, 2018, are pretext for unlawful retaliation.  Mr. Ballenger's call to Mr. Graham on February 2, 2018, four days *before* the date of the letter from Ms. Avery-Craft ostensibly requesting Mr. Graham's removal from work on the site, indicated that Mr. Ballenger and others were seeking a path to terminate Mr. Graham through a method permitted under the Agreement and the Contract, such that their retaliatory animus would not be overt.

56.     Mr. Ballenger's retaliatory animus was exposed when he seized prematurely on wildly inaccurate information – that dayshift Foreman, Mr. Manual, allegedly heard from Mr. Reynolds that he had warned Mr. Graham about washing clothes on site and that security guards had observed Mr. Graham washing clothes on February 2, 2018 – and called Mr. Graham to terminate him on the evening of February 2, 2018.

57.     After Mr. Graham explained the discrepancy and requested more clarity from Mr. Ballenger, Mr. Ballenger was forced to backtrack and easily verified that Mr. Reynolds did not "warn" Mr. Graham at all, and that the information was not accurate.

58.     Under the Agreement, Mr. Ballenger was not permitted to terminate Mr. Graham on such an unsubstantiated basis and first-time violation, and he was forced to call Mr. Graham back, apologize and inform Mr. Graham that he was to report to work for his next scheduled shift (Tuesday, February 6, 2018).

59.     Clearly, between Friday evening February 2, 2018, and Tuesday, February 6, 2018, Mr. Graham's superiors sought out a stronger justification to which they could attribute Mr. Graham's termination and silence his ongoing complaints.

60.     Upon information and belief, Ms. Avery-Craft worked closely with Mr. Ballenger and others, and moreover, she admitted to Mr. Graham during his June 18, 2018, call with her that she relied on the word of Mr. Ballenger that Mr. Reynolds had heard from two campus security guards that Mr. Graham was washing his clothes in the Child Care Center on February 2, 2018, which was patently false.

61.     Ms. Avery-Craft could have easily verified the truth of such allegations through video footage from the Child Care Center on February 2, 2018.

62.     Honeywell's claimed basis for terminating Mr. Graham was nothing more than a pretext for unlawful retaliation for Mr. Graham's protected activities.

63.     Honeywell is therefore liable for Mr. Graham's damages as a result of its termination of Mr. Graham in retaliation for his complaints regarding Honeywell's false recording of employee time and false claims under its contract with a federal agency in violation of the FCA.

64.     Such unlawful actions have resulted in significant financial and emotional burdens for Mr. Graham. Mr. Graham immediately lost his and his family's source of income, and even after finding employment following Honeywell's unlawful termination, Mr. Graham's earnings were significantly less than he was paid at Honeywell for several months.  Further, Mr. Graham has experienced extreme emotional anguish and distress related to his abrupt unlawful termination, for which Mr. Graham has had to seek medical treatment and therapy at significant cost.  Mr. Graham is entitled to two times the amount of backpay owed for the period beginning February 6, 2019, through the present, plus interest on that backpay.  Moreover, Mr. Graham is entitled to compensatory damages for emotional distress and reimbursement of all medical bills. Finally, the FCA permits Mr. Graham to recover all litigation costs, including reasonable attorneys' fees, which continue to accrue.  *See* 31 U.S.C. § 3730(h)(2).

## V.     FIRST CLAIM FOR RELIEF
### (Retaliation in Violation of the False Claims Act, 31 U.S.C. Section 3730(h))

65.     Mr. Graham hereby incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

66.     Honeywell cannot retaliate against an employee who engages in protected conduct under the FCA, by taking lawful actions in furtherance of an FCA action, including investigation for, testimony for, or assistance in an action filed under the FCA.

67.     An employee has engaged in protected conduct when litigation under the FCA is a distinct possibility, when the conduct reasonably could lead to a viable FCA action, or when litigation is a reasonable possibility.

68.     An employee need not actually file a *qui tam* suit or even know about the protections of Section 3730(h) to qualify for protection under the retaliation provision.

69.     An employee who characterizes the employer's conduct as illegal or fraudulent, or recommends that legal counsel become involved, engages in protected conduct.

70.     The FCA "imposes civil liability on any person who knowingly uses a false record or statement to get a false or fraudulent claim paid or approved by the Government, 31 U.S.C. Section 3729(a)(2), and any person who conspires to defraud the Government by getting a false or fraudulent claim allowed or paid, Section 3729(a)(3)." *Allison Engine Co., Inc. v. United States ex rel. Sanders*, 553 U.S. 662, 665 (2008) (internal quotations omitted); *see also Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 463 (2007).

71.     An employee who internally reports false or fraudulent claims presented to the government engages in protected activity. *United States ex rel. Ackley v. Int'l Bus. Machines, et al.,* 110 F. Supp. 2d 395, 400 (D. Md. 2000).

72.     Based on the facts known to Mr. Graham at the time, his activities could reasonably have led to a viable FCA action.

73.     A reasonable employee in the same or similar circumstances as Mr. Graham would have believed that Honeywell was defrauding the government.

74.     A reasonable employee in the same or similar circumstances as Mr. Graham would have believed that he/she was being pressured to present a "false claim for payment" to

the government. *See Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 785 (4th Cir. 1999) (citing *United States v. Rivera*, 55 F.3d 703, 709 (1st Cir. 1995)).

75.     Honeywell would not have made its retaliatory decisions had Mr. Graham not engaged in the protected activities.

WHEREFORE, Mr. Graham respectfully requests that he be awarded the following relief against Honeywell:

a.      Economic damages for lost wages and benefits, including two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the retaliation and reprisal;

b.      Compensatory (non-economic) damages, including but not limited to damages for emotional distress and loss of reputation;

c.      Punitive damages to punish Honeywell for malicious acts of retaliation and to deter it from similar retaliatory conduct toward other employees;

d.      Injunctive or equitable relief, as may be appropriate, to prevent further harm to others and the public caused by Honeywell's retaliation against a whistleblower;

e.      Reasonable litigation costs, expert fees, and reasonable attorneys' fees; and

f.      Any other such relief that the Court may deem just and equitable.

## VI.     SECOND CLAIM FOR RELIEF
### (Withholding of Wages in Violation of Md. Code, Lab. & Emp't Art., § 3-501 *et seq.*)

76.     Mr. Graham hereby incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

77.     Under the Wage Payment and Collection Law ("MWPCL"), Mr. Graham was entitled to all payments promised to him by Honeywell.

78.     Honeywell failed to pay and willfully and knowingly withheld wages owed to Mr. Graham for work performed, including overtime wages owed to Mr. Graham for hours worked in excess of eight (8) hours in one workday.

79.     Mr. Graham complained to his supervisors that he was not being compensated wages he was owed by Honeywell, including that he was being paid for less hours of overtime than he was entitled to as well a failure to pay him for sufficient hours at his Regular Rate of Pay (straight time) on weeks where he worked 36 hours.

80.     Honeywell is, and at all relevant times was, an "Employer" under the MWPCL, Md. Code, Lab. & Emp't Art., § 3-501(b), because it employed individuals within the State.

81.     Honeywell was required by the MWPCL to pay Mr. Graham all wages which it promised him and to which he was entitled.

82.     Overtime and straight time wages owed to Mr. Graham constituted "wages" under the MWPCL, pursuant to Md. Code, Lab. & Emp't Art., § 3-501, because such wages were compensation promised and due to Mr. Graham from Honeywell.

83.     Honeywell failed to obtain Mr. Graham's consent to change the terms of his regular hours and overtime pay and failed to provide Mr. Graham advance notice of one pay period that it intended to change Mr. Graham's wages in violation Md. Code, Lab. & Emp't Art., § 3-504(a)(3).

84.     Defendants have violated the MWPCL willfully.

85.     Due to Honeywell's violations of the MWPCL, Mr. Graham is entitled to recover from Honeywell his unpaid wages, liquidated damages, reasonable attorneys' fees, and the costs of this action, pursuant to the MWPCL.

WHEREFORE, Mr. Graham respectfully requests that he be awarded the following relief against Honeywell:

     a.   Plaintiff's unpaid wages, including overtime compensation and other wage differentials, due to him pursuant to the MWPCL.

     b.   Liquidated damages equal to three times his unpaid wages under the MWPCL given Honeywell's willful conduct in violation of the MWPCL.

     c.   Prejudgment interest.

     d.   Reasonable attorneys' fees as well as the costs of this action; and

     e.   Any other such relief that the Court may deem just and equitable.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury in this action.

Respectfully Submitted,

_____/s/_____
Joyce E. Smithey, Esq., Federal Bar No. 27531
Reuben W. Wolfson, Esq., Federal Bar No.07248
Smithey Law Group LLC
706 Giddings Avenue, Suite 200
Annapolis, MD 21401
(410) 919-2990 (Phone)
(410) 280-1602 (Facsimile)
joyce.smithey@smitheylaw.com
reuben.wolfson@smitheylaw.com

Date: February 5, 2021