## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

DARRYL GRAHAM,

    Plaintiff,

    v.

HONEYWELL INTERNATIONAL, INC.,

    Defendant.

Civil Action No. TDC-21-0310

## MEMORANDUM OPINION

Plaintiff Darryl Graham has filed a Motion for Leave to Amend the Complaint, ECF No. 34, in which he requests that the Court reconsider its prior dismissal of this case and grant leave to file an Amended Complaint. Having reviewed the materials submitted, the Court finds no hearing necessary. *See* Local Rule 105.6. For the reasons set forth below, Graham's Motion for Leave to Amend the Complaint will be GRANTED, and this case will be reopened.

## BACKGROUND

On February 5, 2021, Graham filed a Complaint that included a claim of retaliation under the False Claims Act ("FCA"), 31 U.S.C. § 3730 (2018), based on his termination after complaining about various practices relating to his work on a government contract between Defendant Honeywell International, Inc. ("Honeywell") and the United States government ("the Government"). On November 12, 2021, the Court issued a Memorandum Opinion, ECF No. 25, which is incorporated herein by reference, granting Honeywell's Motion to Dismiss, dismissing the Complaint, and closing this case. *See Graham v. Honeywell Int'l, Inc.*, No. TDC-21-0310, 2021 WL 5304216, at *7 (D. Md. Nov. 12, 2021). On the present Motion, the factual background

derives from the allegations in the proposed Amended Complaint ("the Amended Complaint"), ECF No. 34-2.

## I.      Factual Allegations

Graham worked for Honeywell as a journeyman steamfitter from October 15, 2015 to February 8, 2018.  He was a member of Steamfitters Local Union No. 602 of the United Association ("the Union") and was paid at an hourly rate on contractual terms set by the Union's negotiated agreements with the Mechanical Contractors Association of Metropolitan Washington, Inc. and Honeywell ("the Union Agreements").  At the times relevant here, Graham was assigned to perform facility maintenance duties at the United States Food and Drug Administration ("FDA"), Federal Research Center, on the FDA's White Oak Campus in Silver Spring, Maryland, pursuant to a contract between Honeywell and the United States General Services Administration ("GSA") for night shift maintenance at FDA ("the night shift contract").  In addition to the night shift contract, Honeywell also had a separate contract with GSA for facility maintenance tasks to be performed during daytime hours ("the day shift contract").  The terms of the two contracts were not identical.  The day shift crew was to be paid at a lower rate than the night shift crew, and the day shift contract required certain work that was not included within the scope of the night shift contract and would thus be performed at a lower hourly rate.  Although GSA's contract with Honeywell required night shift coverage for 14 hours per day, 5 days per week, from 5:00 p.m. to 7:00 a.m., Graham was assigned by Honeywell to work a 12-hour night shift from 6:00 a.m. to 6:00 p.m. on four consecutive days, followed by four consecutive days off, referred to as a "four-on, four-off schedule."  Am. Compl. ¶ 21, ECF No. 34-2.

In the Amended Complaint, Graham alleges two main problems with Honeywell's practices and representations to the federal government.  First, he alleges that under the terms of

the Union Agreements, he should have been paid overtime for all hours worked over eight hours per day, but that on January 18, 2016, he was instructed by his Honeywell supervisor, Project Manager Gary Ballenger, to record his time as consisting of 10 straight-time hours and 2 overtime hours for a typical 12-hour day. Between January 2016 and January 2018, Graham repeatedly complained about this practice orally and in writing to Ballenger and his Union Business Representative, Chris Madello, but both told him to continue to record his time in this manner, which he believed was inconsistent with the Union Agreements and therefore inconsistent with the government contracts which he understood to incorporate those agreements.

Second, Graham alleges that between January 2016 and January 2018, he and other workers on the night shift contract were frequently assigned work by Honeywell that was part of the day shift contract and not part of the permissible scope of work for the night shift contract. On May 3, 2017, Graham was cautioned not to mention this fact to Honeywell General Manager of Field Operations Scott Schroeder when Schroeder visited FDA for a tour of the facilities. At this point, Graham came to believe that performance of day shift work by night shift employees could lead to overbilling for those services because the night shift crew was paid at a higher rate than the day shift crew. In September 2017, Graham learned that one of his co-workers had overheard Ballenger brag that he was making a 60 percent profit on the night shift contract workers, which sounded unreasonable to Graham and caused him to again look into the pay practices.

On December 18, 2017, the GSA Office of the Inspector General ("OIG") received a hotline complaint about contract practices and management at the FDA's White Oak Campus at which Graham worked. The OIG conducted an audit and issued a report ("the OIG Report") that concluded that the GSA Public Buildings Service, National Capital Region ("PBS NCR"), had mismanaged its contracts with Honeywell, resulting in overpayments by the Government to

3

Honeywell for work associated with the night shift contract. *See* Am. Compl. ¶¶ 76-89; OIG Report at 11-14, Am. Compl. Ex. 3, ECF No. 34-6.

From October 2017 to January 2018, Graham objected on multiple occasions, orally and in writing, to Honeywell's practice of requiring night shift employees to perform day shift work during night shift hours to both Madello and the day shift foreman, Frank Manual. For example, in October 2017, Graham and his co-workers requested that Manual and others in management stop shifting day shift work onto the night shift contract, or at least to make a written record when they did so, but Manual angrily denied that request. Graham continued to complain about what he characterized as "illegal work shifting practices," including expressing his belief that the practice violated Honeywell's contract with the Government. Am. Compl. ¶ 64. On January 5, 2018, he sent an email to Madello complaining about both the movement of day shift work to the night shift and the overtime pay practice. On January 26, 2018, Madello responded to Graham by stating that the overtime work schedule of 10 straight-time hours for 4 days per week was permissible under the Union Agreements.

Less than two weeks later, Ballenger called Graham at home and attempted to fire him on the grounds that he had allegedly used a washing machine at the FDA worksite without permission. This attempted firing was unsuccessful because the night shift foreman, Eddy Reynolds, had given Graham permission to use the washing machine. However, when Graham arrived at FDA for his next scheduled shift on February 6, 2018, Quinten Mincy, the shop steward, told him that he was being terminated at the request of GSA, and he was escorted off the premises. Two days later, Madello told Graham that before the termination, Ballenger had called Madello and asked if he could terminate Graham, but when Ballenger acknowledged that Graham had not engaged in any conduct warranting termination, Madello told him that he was not permitted to terminate Graham.

4

Shortly afterwards, Madello sent to Graham a copy of a letter from the GSA Contracting Officer to Honeywell requesting that Graham be removed for having used the washing machine. Graham denies having used the washing machine without authorization.

## II.    Procedural History

On February 5, 2021, Graham filed suit against Honeywell alleging retaliation in violation of the FCA and a violation of the Maryland Wage Payment and Collection Law ("MWPCL"), Md. Code Ann., Lab. & Empl. §§ 3-501 to 3-509 (LexisNexis 2016).  On May 21, 2021, Honeywell filed a Motion to Dismiss, which the Court granted on November 12, 2021, resulting in the dismissal of both of Graham's claims and the closing of the case.  On December 10, 2021, Graham filed a "Motion to Alter and/or Amend Judgment and/or Motion for Leave to Amend Complaint," which the Court denied without prejudice for procedural reasons.  In the presently operative Motion for Leave to Amend the Complaint, ECF No. 34, filed on February 4, 2022, Graham "seeks reconsideration of the dismissal of his claims under the FCA" and requests that the Court grant "leave to amend his complaint to include additional and newly discovered evidence in support of his FCA retaliation claim," including an "Office of Inspector General audit of the work performed under the building services contracts" at the FDA's White Oak Campus. Mot. Amend ¶¶ 6-7, ECF No. 34.  Accordingly, the Court construes Graham's Motion as seeking reconsideration pursuant to Federal Rules of Civil Procedure 59(e) or 60(b) of the Court's prior judgment of dismissal and for leave to file an Amended Complaint under Rule 15.

## DISCUSSION

In the Amended Complaint, Graham pleads a more robust factual predicate to support his FCA retaliation claim and does not seek to reassert his MWPCL claim.  Graham argues that he should be granted leave to file the Amended Complaint because it would be his first amendment

of the original Complaint, and he has now established a plausible claim for retaliation under the FCA because with the newly alleged facts he has now shown that his objections to Honeywell's timekeeping and work assignment policies constituted an attempt to prevent an FCA violation. Honeywell argues that the Motion should be denied because: (1) Graham has not moved to vacate the Court's order dismissing the original complaint; (2) any such motion for reconsideration would fail under Rule 59(e) or 60(b); and (3) Graham's amendment is futile because the proposed Amended Complaint fails to state a claim for retaliation under the FCA.

## I.    Leave to Amend

Because final judgment has been entered, the Court may not grant leave to amend unless the judgment is vacated pursuant to Federal Rule of Civil Procedure 59(e) or 60(b). *Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d 369, 378 (4th Cir. 2012).  Contrary to Honeywell's claim, Graham's Motion specifically requests "reconsideration of the dismissal of his claims," Mot. Amend ¶ 7, which the Court construes as seeking the vacating of the judgment under Rule 59(e) or Rule 60(b).  Where Graham specifically filed a timely Rule 59(e) motion, ECF No. 27, the present Motion is properly construed as an amendment to the original Rule 59(e) motion and is therefore timely.  Alternatively, the Motion is properly construed as a Rule 60(b) motion that may be filed "within a reasonable time" and can be granted for "any other reason that justifies relief," and such a reason exists where Graham relied on the Court's extension of the deadline for filing a motion for reconsideration. Fed. R. Civ. P. 60(b)(6).  Either way, the Court will not deny the Motion as untimely.

Under these circumstances, where reconsideration is sought for the purpose of seeking leave to amend the complaint, a conclusion that leave to amend should be granted is a sufficient basis to vacate a judgment. *See Mayfield*, 674 F.3d at 379; *Laber v. Harvey*, 438 F.3d 404, 428

(4th Cir. 2006). Thus, the analysis centers on whether leave to amend is warranted under Rule 15(a)(2).

Rule 15(a) requires that leave to file an amended complaint should be "freely given when justice so requires." Fed. R. Civ. P. 15(a)(2). "A motion to amend should be denied 'only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile.'" *HCMF Corp. v. Allen*, 238 F.3d 273, 276 (4th Cir. 2001) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 242 (4th Cir. 1999)). To determine whether a proposed amended complaint would be futile, the Court reviews the revised complaint under the standard used to evaluate a motion to dismiss for failure to state a claim. *Katyle v. Penn Nat. Gaming, Inc.*, 637 F.3d 462, 471 (4th Cir. 2011). "[D]elay alone is not sufficient reason to deny leave to amend." *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 509 (4th Cir. 1986). Leave to amend may be granted even where claims had been previously dismissed with prejudice, provided that such amendment serves the ends of justice. *See Adbul-Mumit v. Alexandria Hyundai, LLC*, 896 F.3d 278, 293 (4th Cir. 2018).

Here, the Amended Complaint is the first proposed amendment and is offered at the early stages of the case. Although it would require Honeywell to re-enter a case from which it had been dismissed, Honeywell did not have to engage in discovery before the original claims against it were dismissed. Indeed, Honeywell has not asserted bad faith or undue delay on the part of Graham, nor has it argued that it would be prejudiced by a grant of leave to amend the complaint. The Court therefore finds no bad faith, undue delay, or prejudice that would warrant denial of leave to amend. *See Scott v. Fam. Dollar Stores, Inc.*, 733 F.3d 105, 119 (4th Cir. 2013) (finding no undue prejudice despite a "three-year period" between the filing of the initial complaint and the amendment where the parties were "still in discovery, and many steps removed from trial"). Thus,

7

unless the proposed Amended Complaint can be deemed to be futile, the Court will grant the Motion both as to reconsideration and leave to amend the complaint.

## II.    FCA Retaliation

In assessing whether the Amended Complaint is futile, the Court considers whether it states a plausible FCA retaliation claim. The FCA imposes civil liability for submitting false claims to the Government, including against any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1). A "claim" includes "any request or demand, whether under a contract or otherwise, for money or property" that "is presented to an officer, employee, or agent of the United States." *Id.* § 3729(b)(2). The FCA's provision barring retaliation states that:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

31 U.S.C. § 3730(h)(1). To state a plausible FCA retaliation claim under § 3730(h), a plaintiff must allege facts sufficient to support a reasonable inference that: (1) the plaintiff engaged in protected activity; (2) the plaintiff's employer knew about the protected activity; and (3) the employer took adverse action against the plaintiff as a result. *See United States ex rel. Grant v. United Airlines Inc.*, 912 F.3d 190, 200 (4th Cir. 2018). As in Graham's original Complaint, the Amended Complaint plausibly alleges that Graham objected to Honeywell's overtime and work assignment policies and that Honeywell, through its supervisors, knew of Graham's opposition. After repeated objections, Graham was fired under highly dubious circumstances, making it

8

plausible that his termination was executed in response to his protests. The question on the Motion is therefore whether the Amended Complaint provides sufficient facts to demonstrate that Graham's stated opposition to these activities was protected activity under the FCA.

Honeywell argues that amendment is futile because Graham's proposed Amended Complaint does not add factual allegations sufficient for Graham's actions to qualify as "protected activity" under the FCA. As reflected in the statutory language, the FCA recognizes two types of protected activity: (1) acts "in furtherance of" an FCA action; and (2) "other efforts to stop" one or more FCA violations. 31 U.S.C. § 3730(h)(1). Neither form of protected activity necessarily requires the existence of a substantive FCA claim, as "retaliation can occur while employees are investigating or collecting information about a possible fraud, before they have put all the pieces of the puzzle together." *Glynn v. EDO Corp.*, 710 F.3d 209, 214 (4th Cir. 2013). Nevertheless, the first prong, taking acts in furtherance of an FCA action, requires that the protected activity occurred when there was "a distinct possibility" of litigation under the FCA, or that there was conduct that "reasonably could lead to a viable FCA action," as determined from the "perspective of the facts known by the employee at the time of the protected conduct." *United States ex rel. Grant*, 912 F.3d at 200-01 (quoting *Mann v. Heckler & Koch Def., Inc.*, 630 F.3d 338, 344 (4th Cir. 2010)). Thus, to establish such protected activity, Graham would have to show that the practices he complained about—the recording of 10 hours of straight time each day and the orders to night shift employees to conduct work that was supposed to be conducted by day shift employees—reasonably could form the basis of a viable FCA claim.

The second prong, making "other efforts to stop" an FCA violation, requires facts sufficient to support the inference that a plaintiff's actions were "motivated by an objectively reasonable belief that the employer is violating, or soon will violate, the FCA." *Id.* at 201. Thus, for Graham

9

to allege plausibly that he engaged in protected activity under the second prong, he must advance facts that support a reasonable inference that he believed Honeywell was violating the FCA, that this belief was reasonable, that he registered his complaints based on that belief, and that his complaints "were designed to stop one or more violations of the FCA." *Id.* at 201-02.

## A.    Overtime

The Amended Complaint adds little to the allegations regarding Graham's protests about overtime pay. Although Graham now alleges that Honeywell "was supposed to provide 14 hours of [night shift] coverage but employees only worked 12, resulting in an overpayment to Honeywell by the Government," and that Honeywell "routinely short-staffed shifts but collected payment for full staffing," Am. Compl. ¶¶ 81, 87, he does not connect these allegations of fraud to the contents of his own complaints about the overtime pay policy made to his supervisors at Honeywell. Graham does not claim that he complained to his supervisors about the duration of the night shift or short-staffing, or that he knew that the night shift was supposed to last 14 rather than 12 hours. Instead, as in the original Complaint, Graham alleges only that he protested when he was required to record overtime after 10 rather than 8 hours of work per day, in violation of Honeywell's Union Agreements. *See id.* ¶¶ 18-25. The OIG Report referenced in the Amended Complaint makes no mention of Honeywell's overtime pay policies and provides no grounds to infer that these overtime practices caused a financial loss to the Government. Therefore, as stated in the Court's prior Memorandum Opinion, even if Graham's allegations are deemed sufficient to show that Honeywell's contracts with the Government actually incorporated the overtime arrangements set forth in the Union Agreements, and that the system of recording two hours of overtime for each 12-hour day would both violate those terms and result in bills that were inconsistent with the terms of the contracts, any alleged misrepresentations in the pay records on the number of hours eligible

for overtime pay would have actually reduced the labor costs to the Government. *See Graham*, 2021 WL 5304216, at \*4.

The False Claims Act is not "a vehicle for punishing garden-variety breaches of contract" that are not material to the Government's decision to pay. *Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989, 2003 (2016); *see also United States v. Triple Canopy, Inc.*, 857 F.3d 174, 177 (4th Cir. 2017) (stating that the FCA is "cabined by [a] rigorous materiality requirement"). Consistent with the materiality requirement, the United States Court of Appeals for the Fourth Circuit has found that the submission of false claims that under bill the Government would not constitute a violation of the FCA. *See Carlson v. DynCorp Int'l LLC*, 657 F. App'x 168, 173-74 (4th Cir. 2016). Where Graham does not allege that he complained about the duration of the night shift or short-staffing in relation to his overtime pay, and where the Amended Complaint again fails to explain how Honeywell's practice of instructing employees to record overtime after 10 rather than 8 hours of work per day could have resulted in a false claim causing financial loss to the Government, an FCA violation on the basis of overtime pay was not a "distinct possibility" from the perspective of the facts known by Graham at the time of his objections, nor was Graham's belief that an FCA violation had or would soon occur on the basis of overtime pay "objectively reasonable." *United States ex rel. Grant*, 912 F.3d at 200-02. Accordingly, the Court finds that Graham's proposed amendment relating to the overtime allegations is futile.

**B.    Night Shift Work Assignments**

With respect to Honeywell's practice of requiring night shift workers to perform tasks under the day shift contract, however, the Amended Complaint goes further. It now makes plausible that Graham's resistance to performing day shift tasks as a night shift employee constituted an attempt to stop an FCA violation and that Honeywell was on notice of this protected

11

activity prior to his termination. *See id.* at 200; 31 U.S.C. § 3730(h)(1). Significantly, the Amended Complaint now explains how Honeywell's work assignment practices could lead to an FCA violation. First, Graham has now alleged that: (1) the day shift contract required work that was not required of the night shift contract; (2) night shift employees were "paid at a higher rate than [the] daytime crew," Am. Compl. ¶ 31; (3) Honeywell assigned night shift employees to perform certain day shift work; and (4) Honeywell was overpaid for "work that was performed under the [day shift] contract but billed under the [night shift] contract." *Id.* ¶ 89.

Second, the Amended Complaint references the OIG Report, which concluded that GSA had "overpaid Honeywell by approximately $5.6 million for the after-hour O&M services," consisting of the work under the night shift contract. OIG Report at 12. In addressing the overpayment, the OIG Report described the contract arrangement with Honeywell as requiring GSA to pay Honeywell based on the number of hours of work performed by the night shift crew, which were separate and apart from the number of hours performed by the day shift crew. The payments under the night shift contract were based on both the length of the shift worked and the number of staff required to work during that shift to fulfill the work required to occur overnight. The OIG Report also concluded that Honeywell had charged GSA for additional hours not actually worked by the night shift crew.

By establishing that the payment terms of the night shift contract were dependent on the number of hours and workers actually needed during the night shift, the OIG Report provides significant, additional allegations that demonstrate how improperly shifting additional responsibilities onto the night shift crew could result in additional costs to the Government, as it could allow Honeywell to bill additional hours or workers to the night shift contract. Combined with the allegation that the hourly rate for the night shift contract was higher than for the day shift

contract, these facts render plausible the claim that the practice objected to by Graham—shifting day shift tasks to the night shift—could result in financial loss for the Government and overpayment to Honeywell. Although Honeywell argues that the OIG Report found that the specific overpayment it identified was the result of an estimating error by PBS NCR, and that error was not based on improper shifting of work to the night shift, the significance of the OIG Report is not that it uncovered the specific fraudulent practice alleged by Graham, but that it provides facts about the contract arrangement that demonstrate how that practice could cause a loss to the Government.

These facts collectively support Graham's additional assertion that at the time he complained about practice of shifting day shift work to the night shift, he "reasonably believed" that this practice was "outside the parameters" of Honeywell's contract with the Government and that it "could lead to overbilling for those services as the nighttime crew was paid at a higher rate than [the] daytime crew." Am. Compl. ¶ 31. The reasonableness of this belief is bolstered by the further allegations that Graham learned that Ballenger had bragged that Honeywell was making a "60% profit on the nighttime contract workers," which arguably confirmed that there was a financial incentive to Honeywell to be able to shift more work to that shift, *id.* ¶ 32, and that he was warned not to discuss the shifting of daytime work to the night shift in front of a visiting Honeywell official, which could signify that the practice was improper. This "objectively reasonable" belief that Honeywell may have been violating the FCA through its work assignment practices is sufficient to support a finding that Graham's complaints were protected activity. *See United States ex rel. Grant*, 912 F.3d at 201-02. Protected activity does not require the actual existence of a substantive FCA claim, as "retaliation can occur while employees are investigating or collecting information about a possible fraud, before they have put all the pieces of the puzzle

together." *Glynn*, 710 F.3d at 214.  At this early stage, the Court will not find as a matter of law that Graham cannot succeed on his claim that his termination following repeated objections to Honeywell's work assignment practices constituted retaliation in violation of the FCA.

Because the additional facts in the Amended Complaint make plausible Graham's FCA retaliation claim on the basis of Honeywell's work assignment practices, the proposed amendment is not futile and is in the interests of justice.  *See Simmons v. UM Capital Region Health, Inc.*, No. PX-21-2074, 2022 WL 2065932, at *4 (D. Md. June 8, 2022) (granting leave to amend following dismissal of an FCA retaliation claim where the proposed amendment added facts explaining how a defendant's practices could constitute an FCA violation).  The Court will therefore grant leave to file the Amended Complaint.

## CONCLUSION

For the foregoing reasons, Graham's Motion for Leave to Amend the Complaint, ECF No. 34, will be GRANTED, and this case will be reopened.  A separate Order shall issue.

Date:  September 2, 2022

THEODORE D. CHUANG
United States District Judge